FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUL 13 2009

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JANE M. MATTOX,            )
                           )
                           )
        Plaintiff,         )
                           )        CIVIL ACTION FILE
                           )
v.                         )
                           )        No. 1:06-cv-2090-TCB
LIFE INSURANCE COMPANY OF  )
NORTH AMERICA, a           )
subsidiary of the CIGNA    )
CORPORATION,               )
                           )
        Defendant.         )

## O R D E R

This action is an appeal of a benefits determination under a long-term
disability plan ("LTD Plan") as defined and governed by the Employee
Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA").
This matter is now before the Court on the parties' supplemental cross-
motions for summary judgment [143, 152].

## I. Background

Plaintiff Jane Mattox, while employed by AMVESCAP as an executive administrative assistant to the general counsel, participated in her company's LTD Plan and life insurance plan ("Life Plan") as defined and governed by ERISA. Defendant Life Insurance Company of North America ("LINA") issued and funded both plans, and serves as the claims administrator and payor for each.

On September 1, 2006, Mattox filed this lawsuit asserting that LINA improperly denied her claims for (1) LTD benefits, (2) an increase in LTD benefits, and (3) a waiver of life insurance premium benefit ("WOP benefit"). LINA filed a counterclaim asserting that it was entitled to recover a portion of the LTD benefits actually paid to Mattox based on her collection of Social Security disability payments.

### A. Procedural History

On June 4, 2007, the parties filed cross-motions for summary judgment [46, 48]. On March 13, 2008, the Court entered an Order granting in part and denying in part the parties' cross-motions. *Mattox v. Life Ins. Co. of N. Am.*, 536 F. Supp. 2d 1307 ("*Mattox I*"). In *Mattox I*, the Court granted summary judgment to LINA on Mattox's claims for LTD

benefits increase and the WOP benefit. *Id.* at 1321. Additionally, the Court granted summary judgment to LINA on its counterclaim for overpaid benefits. *Id.* at 13. However, the Court granted summary judgment to Mattox on her claim for LTD benefits. *Id.* at 1327.

With respect to Mattox's claim for LTD benefits, the Court first determined that because LINA was both the claims administrator and the potential payor of claims, a conflict of interest existed and therefore Mattox's claim for LTD benefits was subject to the Eleventh Circuit's heightened arbitrary and capricious standard applied to those ERISA claims in which a conflict of interest is present. *Id.* at 1322-23. Under that standard, the Court first had to determine whether "the claim administrator's decision [was] wrong."[1] *Potter v. Liberty Life Assurance Co. of Boston*, 132 F. App'x 253, 257 (11th Cir. 2005) (internal quotations omitted). "If so, the [C]ourt then [had to] determine[] whether the decision [was] nonetheless reasonable (i.e. not arbitrary and capricious)." *Id.* Finally, "[i]f the decision [was] wrong but reasonable, the burden [was then placed] on the claims administrator to show the decision was not tainted by

[1] The Eleventh Circuit has explained that the term "wrong" as used in ERISA cases means "the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claims administrator's plan interpretation." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008).

self-interest." *Id.* (citing *Brown v. Blue Cross & Blue Shield of Ala.*, 898 F.2d 1556, 1566-67 (11th Cir. 1990)).

In applying the heightened arbitrary and capricious standard, the Court concluded that because Mattox's claim file contained conflicting evidence regarding whether she was disabled, "it would be inappropriate to rule that as a matter of law LINA's decision to terminate Mattox's LTD benefits was not wrong. For the same reason, however, the Court cannot rule, as a matter of law, that LINA's decision *was* wrong." *Mattox I*, 536 F. Supp. 2d at 1323-24.

With respect to the inquiry regarding the reasonableness of LINA's decision to terminate benefits, Mattox contended that LINA's decision was unreasonable because LINA gave too much weight to opinions offered by its own Associate Medical Directors (AMDs) while discounting the opinions provided by her treating physicians. *Id.* at 1324. The Court held that "[a]lthough the Court is not convinced that LINA's determination that Mattox was not physically disabled is the only conclusion LINA could have made on the record before it, that conclusion was certainly reasonable, and LINA has adequately demonstrated that there is no genuine issue of fact under this prong." *Id.* at 1325. The Court offered that its decision was

"guided by the principle that under the heightened arbitrary and capricious standard, '[p]lan administrators are not required to give special deference to the opinions of treating physicians.'" *Id.* (quoting *Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1359 (M.D. Fla. 2004)). Consequently, the Court determined that LINA was justified in relying upon the opinions of its AMDs rather than the opinions of Mattox's physicians. *Id.*

Finally, the Court turned to the question of whether LINA had satisfied its burden of showing that the decision to terminate Mattox's benefits was not tainted by bias or self-interest. Because LINA offered no evidence demonstrating that its factual determination that Mattox was not disabled was free of bias, the Court concluded that LINA had failed to carry its burden. *Id.* at 1326. Thus, the Court concluded that Mattox was entitled to summary judgment on her claim for LTD benefits.

On March 27, 2008, LINA filed a motion for reconsideration of the March 13 Order [79] requesting, in part, that the Court await ruling on the motion pending the Supreme Court's decision in *Metropolitan Life Insurance Co. v. Glenn*, ___ U.S. ___, 128 S. Ct. 2343 (2008).

In *Glenn*, the Supreme Court granted certiorari on the following question: "If an administrator that both determines and pays claims under

5

an ERISA plan is deemed to be operating under a conflict of interest, how should that conflict be taken into account on judicial review of a discretionary benefit determination?" 128 S. Ct. at 2346. In answering this question, the Supreme Court implicitly disapproved of the Eleventh Circuit's three-part test under the heightened arbitrary and capricious standard of review, stating that "we [do not] believe it necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict." *Id.* at 2351. The Supreme Court held that an insurer's conflict of interest was but one factor of many that should be considered by a reviewing court in determining whether the insurer's termination of benefits was reasonable. *Id.*

Consequently, on July 29, 2008, the Court entered an Order granting in part LINA's motion for reconsideration. *Mattox v. Life Ins. Co. of N. Am.,* ___ F. Supp. 2d ___, 2008 WL 6205997 (N.D. Ga. July 29, 2008) ("*Mattox II*"). The Court determined that the Eleventh Circuit's three-step approach must be modified in light of *Glenn.* The Court determined that a court need not proceed past the reasonableness inquiry when reviewing an insurer's denial of benefits under the heightened arbitrary and capricious

standard, but should consider any evidence regarding bias or conflict of interest as a part of the reasonableness inquiry. *Mattox II*, 2008 WL 6205997, at *3. The Court further held that evidence that a court should consider regarding a conflict of interest

> may include but is not limited to documents that suggest a "history of biased claims administration" on the part of the insurer or, conversely, evidence that the "administrator has taken active steps to reduce potential bias and to promote accuracy . . . by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking."

*Id.* (quoting *Glenn*, 128 S. Ct. at 2351). Additionally, the Court held that evidence related to "procedural unreasonableness"[2] may also be relevant to the conflict-of-interest factor. *Mattox II*, 2008 WL 6205997, at *3. Moreover, the Court held that in keeping with the Supreme Court's disapproval of special burden-of-proof rules, the burden of proof is on the plaintiff to demonstrate that an insurer's conflict of interest affected its benefits decision. *Id.* at *4.

The Court concluded by vacating the portion of its March 13 Order granting summary judgment to Mattox based on the "now-defunct" third prong of the heightened arbitrary and capricious standard. *Id.* The Court

---

[2] I.e., unfairness in the process by which a claimant's claim is reviewed.

was explicit in holding that *Mattox II* was not to be construed as overruling the Court's determination that a question of material fact exists regarding whether LINA's decision was "wrong." *Id.* However, the Court did recognize that because evidence of conflict-of-interest had to be considered as a part of the reasonableness determination, the Court's holding that no genuine issue of material fact exists with regard to whether LINA's decision was reasonable had to be vacated. *Id.* The Court stated that one issue remained: "whether LINA's decision to terminate Mattox's long-term disability benefits after twenty-four months was reasonable as a matter of law, taking in account any effect LINA's conflict of interest may have had on its termination of Mattox's benefits." *Id.*

The Court's interpretation of *Glenn* was confirmed two months later by the Eleventh Circuit in *Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352 (11th Cir. 2008). In evaluating the proper standard of review for an ERISA case in which a conflict of interest exists, the Eleventh Circuit held:

> We continue to adhere to *Firestone*'s mandate that reviewing courts must consider an administrator's conflict of interest in deciding whether the decision to deny benefits was arbitrary. But we hold that *Glenn* implicitly overrules our precedent to the extent it requires district courts to review benefit determinations by a conflicted administrator under the

heightened standard. We hold that the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious. And we hold that, while the reviewing court must take into account an administrative conflict when determining whether an administrator's decision was arbitrary and capricious, the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest.

*Id.* at 1360 (internal citations omitted). *See also Lee v. Bellsouth Telecomm., Inc.*, 318 Fed. App'x 829, 836 (11th Cir. 2009) ("[I]f there is a conflict of interest, then the reviewing court must consider the conflict as being a factor in determining whether the plan administrator has acted arbitrarily and capriciously."); *Waschak v. Acuity Brands, Inc. Senior Mgmt. Benefit Plan*, No. 1:07-cv-3121-TWT, 2009 WL 103622, at *3 (N.D. Ga. Jan. 14, 2009) ("[A conflict of interest] is just one factor in a flexible analysis where 'any one factor [may] act as a tiebreaker' or, conversely, even shrink down to a 'vanishing point.'" (quoting *Glenn*, 128 S. Ct. at 2351)).

After an extensive period of discovery on the remaining issue in this case, on March 18, 2009, the parties filed cross-motions for summary judgment [143, 152].

## B. Facts Regarding the Impact of Conflict of Interest on LINA's Decision to Terminate Mattox's LTD Benefits[2]

### 1. LINA's Policies and Procedures

Richard Lodi, a senior operations representative for LINA familiar with LINA's procedures for processing and administering claims for LTD benefits under group disability plans, testified by affidavit and deposition regarding LINA's claims philosophy and procedures.

Lodi testified that LINA's claim philosophy is to pay all covered claims and fulfill its contractual and fiduciary responsibilities. He asserted that in evaluating claims under benefits plans insured by LINA, its practice and goal is to review claims fairly, without regard to the manner in which the plan is funded, and to pay claims consistently and in accordance with the applicable benefit provisions so that claims that are payable under the plan are paid and claims that are not payable are not paid. Lodi testified that LINA has recognized that paying claims which are not payable under the Plan does not benefit persons insured as a group. Instead, he asserts

---

[2] The Court will assume that the reader is familiar with the background of this case as presented in *Mattox I*. Thus, the Court will only discuss those facts regarding the impact of the conflict of interest on the claims decision as relied upon by the parties in their supplemental cross-motions for summary judgment.

that such payments could result in increased premiums or reduced benefits to the detriment of all Plan participants and beneficiaries.

Lodi also testified that employees who make decisions for claims of ERISA plan participants are paid fixed salaries that are wholly unrelated to the amount or number of claims paid or denied.[3] He asserts that these individuals are not provided benefits, bonuses, commissions, promotions, or any other incentives based on the number of benefit claims that they approve or deny. Lodi testified:

> No case manager gets more money, better compensation, recognition of any type for denying claims or for approving claims. It's the management of the claims in a timely fashion that can get them that recognition. . . . No one, nothing is

---

[3] Mattox denies the truth of Lodi's assertion. She asserts that CIGNA (LINA's parent company) maintains a Long Term Incentive Plan that allows salaried officers and other key employees to receive "options, SARs, restricted stock, dividend equivalent rights, common stock, and strategic performance units." Lisa Lyle, an appeals claim manager responsible for notifying Mattox that her LTD benefits were terminated, testified that pursuant to this plan, she receives a matching six percent contribution to her 401(k) plan in the form of stock in CIGNA. Additionally, Mattox asserts that certain LINA employees receive performance bonuses based upon performance reviews. Although Mattox served LINA with discovery requests related to the criteria used in these performance reviews and documentation of performance reviews for LINA employees participating in Mattox's claim decision, Mattox asserts that no documentation was provided by LINA. Mattox also asserts that AMDs, including Dr. Seiferth, receive performance bonuses and stock. Finally, Mattox contends that employees throughout LINA and CIGNA are aware of CIGNA's strategic plan.

Even though the above information indicates that employees of LINA may have an interest in the firm's overall well-being, this information does not directly controvert Lodi's testimony that the compensation of employees involved in claims decisions process is not tied to *the amount or number of claims paid or denied*. Thus, the Court accepts Lodi's testimony as true and uncontradicted.

driven by the number of decisions or the number of denials or approvals that anyone makes.

Lodi asserted that the performance of the company as a whole is not considered as a part of the compensation of claims personnel, and neither the claims personnel nor the medical personnel receive bonuses based on the performance of the company as a whole. Further, during the time that LINA was reviewing Mattox's claim, Lodi testified that claims personnel did not receive any stock options from LINA.

Lodi testified that LINA does not establish guidelines or quotas regarding how many claim payments or denials the claims department is expected to make in any given time period. He asserts that employees are evaluated, in part, on the quality of their claim decisions, i.e., whether the claims were handled in accordance with plan documents. However, he asserts, employees are not evaluated on the basis of the number of claims paid or denied. Lodi testified that LINA's focus with respect to new claims is "not whether that new claim is ultimately paid or denied, but is it done timely. Is it within all of the various compliance guidelines? Are the claims paid accurately, are the benefit calculations correct?"

Lodi also testified that LINA has an audit department that reviews claim files on a quarterly basis. These audits are conducted to check the

accuracy, competency, and timeliness of claims decisions in addition to ensuring that relevant medical evidence is reviewed. Additionally, Lodi testified that "[p]art of the task of the appeal team leader . . . is to identify or look for any trends in claims that are resulting perhaps in overturns, or things they're seeing that the core team is doing that . . . they might disagree with."

With respect to the appeals process, Lodi testified that LINA maintains a separate appeal unit for the consideration of denied claims for benefits. Employees in the appeal department are charged with making an independent assessment of the claim decision based on all evidence in the claim file. Lodi also stated that the individual responsible for the appeal does not discuss the claim with anyone outside of the appeal team. "When a decision is made and agreed, signed off on by the appeal team leader, then it would go back to the core team for their action. Prior to that point there is no discussion of corroboration or opportunity for . . . anyone to disagree with the decision."

Lodi also testified that neither the claim department nor the appeal department has any role or responsibility in the management, reporting, or other functions regarding LINA's finances. When asked about how LINA

"walls off" claims administration functions from the company's financial function, Lodi testified that

> [t]here is no direct correlation between the two. I remember from my time as a regional claims manager I would sometimes get queries from individuals in finance, and . . . I would say claims does what claims does. As I tried to explain, there's an expectation that we pay claims that should be paid, and we don't pay claims that shouldn't be paid. And the economic consequences of that are not something that we consider.

Additionally, Lodi asserted that neither claims managers nor appeals specialists have access to reserve information about claims while they are making a claim decision and that no dialogue occurs between claims personnel and firm finance personnel before a decision is made to pay or deny a claim.

Lodi testified that the claims department and appeal unit are completely separate business units from the financial underwriters. Physically, the claims department and appeals units are located in Pittsburgh, Pennsylvania; Dallas, Texas; and Glendale, California, whereas the financial underwriters are located in Philadelphia, Pennsylvania. Lodi goes on to state that in addition to the physical separation, "[t]here is no corroboration or communication regarding any specific claim or claim activity that the claims department or the appeal unit would do with respect

to underwriting." Further, he offers that "[t]here is no impact or instruction that comes from underwriting or anyone in financial about how to do anything with a claim." Lodi also stated that neither the claims department nor the appeal unit is required to seek approval from financial underwriters. Finally, Lodi testified that neither the office of the Chief Financial Officer of LINA nor any of the individuals who report to him have any involvement whatsoever in claim decisions.[4]

## 2. Individuals Participating in Mattox's Claim Decision

Lisa Lyle was an appeals claim manager for LINA at the time that Mattox made her claim for LTD benefits. She wrote the first letter advising Mattox that her LTD benefits would be terminated. At her deposition, she testified that she was an hourly employee at that time and did not receive any compensation other than money. When asked about Mattox's particular claim, Lyle testified that there was no reason she would have treated Mattox's claim differently from other claimants. She also asserted that she felt "free to evaluate each claim on its merit, and make an appropriate decision." She testified that even though she had been

---

[4] Mattox denies the accuracy of Lodi's testimony "based on information available on CIGNA's website." However, because Mattox does not identify what information on CIGNA's website contradicts this testimony, the Court will accept Lodi's testimony as true.

employed by LINA since 1999 and had stock in her 401(k) account issued by LINA's parent corporation, CIGNA, she had no bias in evaluating Mattox's claim.

David Betush was an appeals claim manager for LINA and was responsible for reviewing Mattox's appeal of LINA's decision to terminate her LTD benefits.[5] Ultimately, he made the decision to affirm the denial of Mattox's LTD benefits. At his deposition Betush testified that he was compensated by LINA via biweekly paycheck and that he received only his salary and no stock options or incentive bonuses as a part of his compensation. Betush also testified that his performance is reviewed annually and that the appeals team manager performs periodic audits of his claim files. Further, he stated that the feedback he receives during such audits included "claims handling, timeliness of compliance letters, decision accuracy, [and] whether or not the appropriate medical resource was utilized in making the decision." Betush also testified that he has never had

---

[5] Mattox points out that at the time, Betush's wife, Bobbi Betush, was a team leader and assigned as case manager for Mattox's claim. However, Betush testified that at the time he was unaware that his wife was the team leader for the group that made the initial determination regarding Mattox's claim. Therefore, the Court places no weight on the fact that Betush and his wife were both involved in the claims determination and appeals process for Mattox's claim.

access to the amount of reserves for any claim while making a claim decision.

When asked about Mattox's particular claim, Betush testified, "I have no reason to believe that there [were] any irregularities with the claims handling on this claim" and that he believed it had been handled similarly to other claims he worked on at the time. He also testified that neither he nor any medical doctor assigned to Mattox's appeal requested to conduct a full file medical director review for Mattox's claim. Betush described a full file medical director review as one "where a doctor will actually take the whole file and write out and review each and every [piece] of medical evidence." When questioned about who makes the determination of whether or not to conduct a full file medical director review, Betush testified that "[i]t's not really the decision of the medical reviewer. The medical reviewer will make the suggestion, if questions need [to be] answered or anything needs [to be] clarified and there's a discussion between the medical reviewer and the claims manager, if that action is going to be taken." Betush testified that instead of a full file medical review,

his team conducted a claims staffing session review for Mattox's claim, which consisted of a review of the relevant medical records.[6]

Steven J. Feagin is a medical doctor and an independent contractor with Professional Disability Associates ("PDA"), an entity that provides physician review services for insurance companies, including LINA. Through Feagin's employment with PDA, he reviews disability files and provides medical opinions for insurance companies. Feagin has earned one hundred percent of his income over the past fifteen years by providing medical reviews for insurance companies and other businesses. Feagin maintains board certification in internal medicine and has never had his medical license revoked or suspended. Feagin, through his contract with PDA, reviewed Mattox's medical files during the initial claims determination process. During discovery, LINA initially indicated that Feagin was an AMD with LINA, but later supplemented its discovery

---

[6] Lodi testified that claims employees were permitted to summarize medical records by "briefly encapsulating the medical records in the file, to the point that they focus [on the] issue that needs to be interpreted or addressed to the nurse or physician." Additionally, Lodi made clear that in summarizing the medical records, claims employees were not permitted to exclude any information in the medical records, but only to point the medical expert to the issue in the claim file. He also reiterated that the medical expert "is to have the opportunity to look at the total of the medical evidence in the file and review everything in the claim file."

responses to correct the mistake to reflect that at no time was Feagin an AMD or a LINA employee.

When questioned about how Feagin's performance is reviewed, Lodi testified that Feagin is considered to be a "peer reviewer" and that his work was thus reviewed differently than the work of LINA employees. Lodi testified that with respect to peer review reports, "there is quality control that is applied to them to make sure the peer reviewer is addressing the specific questions." Lodi further testified that

> [w]e rely on the vendors with whom we contract to ensure that the specific physicians or consultants that we're using are qualified and have the appropriate credentials. And with each report that comes in, there's an opportunity for typically a nurse case manager to review those reports and make sure that they're logical and reasonable and what we would otherwise expect to see in relation to answering the specific questions.

Lodi testified that if a nurse case manager finds an irregularity in a peer reviewer's report, the nurse reports the irregularity to the vendor.

Feagin, though not a LINA employee, testified that he was always given the freedom to review the entire claim file if he thought it would be appropriate for the case. Feagin stated that he does not always review full medical files when providing a medical opinion, but rather that his review

is "dependent upon the questions asked" by the insurance company and the "nature of the data presented."

When questioned with regard to potential bias on his part, Feagin testified that he did not know or care whether a claim would be paid as a result of his review; he was not paid more for reaching a particular conclusion; his opinions were rendered independently from the compensation he received; and no one at LINA ever asked him to change his opinion unless it was in the context of reviewing additional information. Feagin stated, "I was always free to give my own opinion and I would not have been involved had I not been." Finally, Feagin also testified that he intentionally avoided purchasing stock in insurance companies for whom he has worked.

Paul D. Seiferth is a medical doctor board certified in family practice. He has been employed as an AMD with LINA since December 2003. He testified that he is paid a yearly salary by LINA, that he receives year-end bonuses based on his performance, and that he has received stock options of less than 150 shares per year since 2005.

Seiferth testified that his performance is evaluated by LINA's "associate vice president for expert resources." He stated that medical

opinions by AMDs are randomly chosen for audit by the chief medical officer of LINA and the associate vice president for expert resources. He testified that such audits were documented in his annual performance reviews, but that the main focus of these reviews was the maintenance of his credentials, involvement in education, and thoroughness and legibility of his documentation in files.

In response to questioning regarding what instructions LINA provides him on how to perform his job, Seiferth responded: "Only to provide my medical expertise as appropriate." He stated that he understood his job to be "to assist the claims manager in understanding the medical documentation, and interpretation of the same, and its impact" and that to the best of his ability he limits his review of medical files to the specific questions presented by the claims department. Seiferth also testified that he has always been given ample time and opportunity to review whatever information was necessary to render a medical opinion with respect to the claim. He stated that no one at LINA ever coerced him into making particular medical decisions.

With respect to Mattox's claim for LTD benefits, Seiferth testified that he provided his medical opinion as a part of Mattox's appeal. He stated

that he could not remember what kind of limited review he conducted for Mattox's claim, but that it was not a "full file review," which consists of his "actually taking the file, and then dictating a complete rendering of the entire record." Finally, when questioned about whether he was biased in the conclusion reached with respect to Mattox's claim, Seiferth testified that he had no bias towards LINA even though it was his employer.

## II.  Motions for Summary Judgment

### A.  Summary Judgment Standard

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant carries the initial burden and must show that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The nonmovant is then required to "go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts

showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Resolving all doubts in favor of the nonmoving party, the Court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.*

## B.    Analysis

The parties' supplemental cross-motions for summary judgment address the sole issue remaining in this case: "whether LINA's decision to terminate Mattox's long-term disability benefits after twenty-four months was reasonable as a matter of law, taking in account any effect LINA's conflict of interest may have had on its termination of Mattox's benefits." *Mattox II*, 2008 WL 6205997, at *3. The burden remains on Mattox to demonstrate that LINA's decision was unreasonable. *See Doyle*, 542 F.3d at 1360; *see also Creel v. Wachovia Corp.*, No. 08-10961, 2009 WL 179584, at *6 (11th Cir. Jan. 27, 2009) ("[T]he burden is on the plaintiff to show the existence of such a conflict, not on the defendant to disprove its influence."); *Oliver v. Coca-Cola Co.*, 546 F.3d 1353 (11th Cir. 2008) ("We

emphasize that [the claimant] would bear the burden of proof on [the reasonableness] issue.").

In her supplemental motion for summary judgment, Mattox asserts that LINA's decision was unreasonable because (1) there were several procedural defects in LINA's claims process; (2) the reviewing physicians, Seiferth and Feagin, had financial and professional incentives that tainted their medical opinions; (3) LINA concealed certain information from Mattox; (4) LINA refused to credit the Social Security Award of disability benefits to Mattox; (5) LINA failed to comply with its own policies and procedures; and (6) LINA ignored the opinions of Mattox's treating physicians.

After careful consideration of Mattox's assertions and LINA's responses, the Court concludes that there are no factors in evidence to indicate that LINA's decision to terminate Mattox's LTD benefits was arbitrary and capricious or that LINA's conflict of interest improperly influenced its exercise of discretion. The evidence in the record shows that LINA's decision was reasonable and supported by substantial evidence. *Cf. McDaniel v. Hartford Life & Accident Ins. Co.*, No. 5:07-cv-7 (CAR), 2008 WL 4426087, at *13-14 (M.D. Ga. Sept. 25, 2008) (holding that insurer's

decision was not arbitrary and capricious and that the evidence indicated that the conflict of interest factor did not play role in the insurer's decision). Whereas Mattox has presented no evidence that LINA has a history of biased claims administration, LINA has presented substantial evidence demonstrating that it has taken active steps to reduce potential bias and to promote accuracy in its claims administration. Thus, the Court concludes that LINA's decision to terminate Mattox's LTD benefits was reasonable as a matter of law, and therefore LINA is entitled to summary judgment on Mattox's claim for LTD benefits.

### 1.    Procedural Defects in Claims Process

In her supplemental motion for summary judgment, Mattox first asserts that the arguments set forth in her original motion for summary judgment demonstrate that LINA's handling of Mattox's claim was procedurally unreasonable. First, Mattox asserted that LINA did not adhere to protocol for claim review and self-servingly focused on the mental illness provision in denying her claim for LTD benefits. Second, Mattox argued that LINA failed to comply with its claims procedure manual and made adverse decisions without obtaining current medical records. Finally, Mattox asserted that LINA failed to follow internal handling

procedures and ERISA requirements and conducted improper medical reviews. Mattox asserts that the Court did not address these arguments, which she incorporates into her supplemental motion.

With respect to Mattox's argument regarding LINA's improper focus on Mattox's alleged mental illness, the Court did in fact address this argument and rejected it in its March 13, 2008 Order. In relevant part, the Court held:

> Mattox first argues that LINA's decision to terminate her LTD benefits after twenty-four months was unreasonable as a matter of law because LINA categorized her disability as a mental illness when in fact her depression was merely a symptom caused by her slipped disc with stenosis. However, even though LINA arguably could have stopped at determining that Mattox's disability was at least contributed to by her depression, it reviewed Mattox's disability from a physical standpoint as well. Therefore, Mattox's contention that LINA reviewed her claim for LTD benefits solely from a mental standpoint is meritless, and LINA's decision therefore was not unreasonable as a matter of law.

*Mattox I*, 536 F.2d at 1324. Mattox has offered no new evidence or argument with respect to this point, and the Court will not alter its conclusion.

With respect to the remaining two arguments regarding procedural unreasonableness from Mattox's original motion for summary judgment, Mattox merely refers the Court to her original motion for summary

judgment. In so doing, Mattox references that portion of her motion for summary judgment addressing claims for (1) increases in LTD benefits, and (2) the waiver of life insurance premium benefit. However, in the March 13, 2008 Order, the Court granted summary judgment to LINA on these claims, and this result was not affected by the Court's July 29, 2008 Order on LINA's motion for reconsideration. Thus, these arguments will not be considered.

### 2. Bias in Seiferth's and Feagin's Testimony

Mattox next asserts that both Seiferth and Feagin are biased due to their employment relationship with LINA and PDA. She asserts that the physicians "derived substantial income solely from conducting medical reviews, demonstrating an inherent bias to deny claims, satisfy LINA (and PDA), so they could continue to earn substantial sums." Mattox also asserts that Feagin and Seiferth's testimony is generally unreliable due to their history of providing biased testimony favorable to insurance companies.

With respect to Mattox's assertion that the physicians have substantial financial incentives, she argues that as a LINA employee, Seiferth earns substantial income and benefits, thereby raising an inference

of bias. Mattox similarly contends that because Feagin earns his income solely by providing medical reviews for insurance companies, his testimony is also biased.

Mattox relies on a number of cases in support of her assertion that the physicians' employment status, either as employees of LINA or as independent contractors for LINA, demonstrates bias. However, Mattox's reliance on these cases is misplaced, as they merely stand for the principle that information regarding reviewing physicians' compensation and employment relationship is relevant to the bias determination and thus discoverable.

For instance, in *Crider v. Life Insurance Co. of North America*, No. 3:07-cv-331-H, 2008 WL 239659, at *6 (W.D. Ky. Jan. 29, 2008), the court recognized that discovery into the compensation of employees and medical personnel who reviewed the plaintiff's claim "is relevant to bias in the decision-making process." However, the Court cautioned that "the mere existence of a long-term financial relationship will not negate a well-reasoned opinion or report." *Id. See also Johnson v. Conn. Gen. Life Ins. Co.*, No. 5:07-cv-167, 2007 WL 2993920, at *2 (N.D. Ohio Oct. 11, 2007) (holding that because there was an employment relationship

between the insurer and the medical reviewer for the plaintiff's claim, the plaintiff was entitled to discovery regarding the extent of the potential conflict of interest); *Powell v. Hartford Fin. Servs. Group, Inc.*, No. 1:06-cv-134-M, 2007 WL 773732, at *3 (W.D. Ky. Mar. 8, 2007) (holding that because plaintiff made an initial showing that the defendant life insurance company had a significant and lengthy relationship with a company providing physicians to conduct medical reviews, the plaintiff was entitled to discovery into the extent of the relationship).

These cases do not stand for the principle that an employment relationship alone establishes bias sufficient to render a claims decision unreasonable. Without more, the fact that LINA compensates Seiferth and Feagin for their opinions does not establish that these physicians are biased or that LINA's reliance on their opinions was arbitrary and capricious. *See, e.g., Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006) ("The singular fact of working in-house does not disqualify a doctor from rendering an independent opinion any more than does paying an outside doctor to do the same"); *Sanders v. Unum Life Ins. Co. of Am.*, No. 3:05-cv-03(CDL), 2009 WL 902046, at *9 (M.D. Ga. Mar. 30, 2009) ("Reliance upon in-house medical consultants who base their evaluations on a review

of medical and vocational records is not, standing alone, an abuse of discretion."); *Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1359 (M.D. Fla. 2004) ("It is entirely appropriate for an administrator to rely on written reports of consultants who have done paper reviews of a claimant's medical records, even if those reports rebut the opinion of the treating physicians asserting claimant is disabled.").

In fact, both Seiferth and Feagin have unequivocally testified that although they are paid to render medical opinions for insurance companies, their employment relationships do not lead them to render a particular conclusion about a claimant's disabilities. Feagin testified that he did not know or care whether a claim would be paid as a result of his review; he was not paid more for reaching a particular conclusion; his opinions were rendered independently from the compensation he received; and no one at LINA ever asked him to change his opinion unless it was in the context of reviewing additional information. He stated, "I was always free to give my own opinion and I would not have been involved had I not been."

Seiferth testified that he has always been given ample time to review information relevant to claims decisions and that no one at LINA has ever coerced him into rendering particular medical opinions. He also testified

that he had no bias towards LINA even though it was his employer. Additionally, Lodi testified that no employee who participates in the claims decision-making process, including a reviewing physician, has any part of his compensation linked to whether a claim is granted or denied. Mattox has provided no evidence to contradict any of this testimony and thus cannot establish that the physicians were biased in rendering their opinions based solely on their employment relationship with LINA.

With respect to Mattox's assertion that Feagin and Seiferth's opinions were tainted and unreliable because "LINA could rely upon [them] to provide opinions favorable to the insurer," Mattox points to six cases, three involving Feagin and three involving Seiferth, in which courts have rejected their opinions. She contends that "[a]lthough the opinions of Feagin and Seiferth which resulted in the denial of benefits have been repeatedly discredited, they are not required to review a claimant's entire medical record and suffer no adverse consequences for failing to do so. . . . The absence of consequences (and the fact that Feagin and Seiferth reaped substantial financial reward for their work) further demonstrates bias." The Court disagrees.

In *Glenn*, the Supreme Court offered that "conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to cases where [a claims] administrator has a history of biased claims administration." *Glenn*, 128 S. Ct. at 2351. However, Mattox has not demonstrated a history of biased opinions offered by LINA's reviewing physicians. Instead, she has offered only three instances for each physician in which a Court has disagreed with his medical opinion. These six cases are insufficient to establish a pattern of biased medical reviews by Feagin and Seiferth.

As an initial matter, in only one of these cases did the reviewing court suggest that the physician's opinion might be the result of bias. *See Moon v. Unum Provident Corp.*, 405 F.3d 373, 382-83 (6th Cir. 2005) ("Furthermore, when a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism.") In the other cases, the reviewing court simply disagreed with the physician's conclusion based upon its review of the administrative record.

Second, Mattox has produced no evidence regarding whether the six cases are truly indicative of a pattern of biased opinions. For instance, Mattox provided no indication of how many reviews Feagin and Seiferth have conducted for insurance companies. Are these six reviews out of ten or one thousand? Additionally, Mattox has provided no evidence regarding how many times each physician has rendered an opinion that ultimately led to the insurer's sustaining a claimant's claim of disability. Without such information, the Court cannot place the three cited cases for each physician in context and thus cannot conclude that either Feagin or Seiferth has a pattern of providing unreliable medical opinions.

Moreover, LINA has produced evidence demonstrating that the reviewing physicians' opinions are audited for accuracy. Lodi testified that Feagin is considered to be a "peer reviewer" and that while LINA relies on the providers of such "peer reviewers" to ensure that their physicians or consultants are qualified and have the appropriate credentials, LINA's nurse case managers review peer reviewer reports to ensure that they are logical and reasonable. If a nurse case manager finds an irregularity, the nurse reports that irregularity to the provider of the peer reviewer. According to Seiferth, LINA randomly selects medical opinions issued by its

AMDs for audit by the chief medical officer and associate vice president for expert resources. Seiferth also testified that such audits are included in the AMD's annual performance reviews. Mattox has offered no evidence to refute this testimony. Thus, Mattox has failed to provide evidence sufficient to demonstrate a pattern of biased medical opinions and has also failed to rebut LINA's evidence that it had procedures in place to encourage physicians to provide accurate evaluations for claims determinations.

The evidence that Mattox has proffered only demonstrates that there was an employment relationship between LINA and the reviewing physicians. The mere existence of an employment relationship with LINA, without more, does not demonstrate bias in the physician's testimony. Additionally, the fact that a few of Feagin and Seiferth's opinions have been rejected by other courts does not persuade the Court to conclude that they acted with bias or rendered improper opinions in this case. Thus, the Court concludes that Mattox has not produced evidence regarding Feagin or Seiferth's testimony sufficient to render LINA's claim decision for Mattox unreasonable as a matter of law.

### 3. "Concealing" of Information

Mattox next asserts that LINA purposefully concealed information in terminating her LTD benefits and that this concealment demonstrates bias.

Mattox asserts that in the September 2, 2003 letter terminating her benefits, LINA referenced an opinion from an AMD to the effect that she was not disabled, but that LINA did not identify that AMD. Mattox also asserts that in the July 16, 2004 letter affirming the termination of benefits, LINA again referred to a review by an unidentified AMD. She contends that LINA's failure to provide the identity of the reviewing AMD in its communication to her "suggests bias as it conceals the identity of the reviewing physicians and makes it harder for the treating physician to contact the reviewing physicians to discuss their opinions and impossible for a claimant [or] her treating physician to assess the qualifications of the reviewer." Mattox also asserts that LINA repeatedly misrepresented to her that Feagin was an AMD for LINA when in fact he was an independent contractor hired through PDA. She asserts that this misrepresentation was a deliberate attempt by LINA to give Feagin's opinion more authority. Finally, Mattox asserts that LINA's failure to timely identify Seiferth as the

reviewing physician for Mattox's appeal of the termination decision further demonstrates bias and procedural irregularities.

The Court cannot agree with Mattox that the above actions indicate bias on LINA's part.

First, failure to disclose information without a request does not constitute purposeful concealment. The fact that LINA did not provide the identities of the reviewing AMDs in its communication terminating Mattox's benefits does not indicate that LINA was attempting to purposefully hide relevant information from Mattox or her treating physician and thus does not indicate bias in LINA's claims determination process. In fact, Lodi testified that at the time of Mattox's claim for LTD benefits, although LINA did not refer to the reviewing physician by name in its communications with claimants, a claimant or her treating physician could request the reviewing physician's identity and contact information from the LINA case manager assigned to the file. That LINA had a process in place to allow claimants or their treating physicians to contact the reviewing physician demonstrates that LINA did not willfully attempt to conceal information from a claimant. Thus, the Court cannot agree that

LINA concealed information from Mattox or that such actions indicate bias by LINA.

Additionally, with respect to the identification of Feagin as an AMD, LINA discovered its error and took proper steps to correct that error in a timely manner. The error does not, as Mattox suggests, indicate a deliberate attempt by LINA to give Feagin's opinion more weight. Further, as LINA correctly points out, the fact that Feagin is an independent contractor and not a LINA employee strengthens LINA's argument that it had no incentive to conceal the true nature of his relationship with LINA. Thus, LINA's failure to properly identify Feagin as an independent contractor with PDA does not demonstrate bias in LINA's claim administration process.

Finally, in the March 13, 2008 Order, the Court noted that it is troubled by LINA's untimely disclosure of Seiferth as the reviewing physician for Mattox's appeal of the termination of her LTD benefits. However, Mattox has not produced any evidence demonstrating that LINA's untimely disclosure was intentional, that Seiferth was not in fact the reviewing physician for Mattox's appeal, or that the untimely disclosure was indicative of a pattern of biased claims administration. Therefore, the

Court cannot conclude that this untimely disclosure alone demonstrates bias by LINA.

Based on the above, the Court concludes that Mattox's arguments regarding LINA's alleged "concealment" of information are all without merit and do not demonstrate bias.

### 4. Refusal to Credit Social Security Award

Mattox next asserts that LINA improperly refused to consider the Social Security Administration's ("SSA") award of disability benefits to Mattox as a part of its claims determination. However, the Court previously rejected this argument in the March 13, 2008 Order. In relevant part, the Court held as follows:

> Mattox also contends that LINA should have given more weight to the SSA's determination that she was totally disabled. It is true that "[a] district court may consider a [SSA] determination of disability in reviewing a plan administrator's determination of benefits under a plan governed by ERISA." *Potter*, 132 Fed. Appx. at 259 n.5. However, "it is not determinative." *Id.* Here, where the SSA's decision to award Mattox benefits rested in part on her emotional inability to focus her attention and her depression, that decision carries little weight with regard to proving her level of physical functionality.

*Mattox I*, 536 F.2d at 1324 n.23. Mattox has not provided any new evidence or argument that would lead the Court to alter its previous

holding. Thus, the Court again rejects Mattox's assertion and concludes that LINA's treatment of the SSA's award of disability benefits does not demonstrate bias and therefore does not render LINA's claim decision unreasonable as a matter of law.

### 5. Failure to Comply with Policies and Procedures

In restating arguments made in her original motion for summary judgment, Mattox asserts that LINA failed to comply with various ERISA regulations and policies and procedures established by CIGNA, LINA's parent company. Mattox asserts that LINA (1) failed to provide her with CIGNA's policies and procedure manual; (2) improperly relied on Feagin's opinion even though he was not properly qualified under ERISA; (3) failed to address Mattox's comments regarding her functional capacity evaluation (FCE); and (4) failed to obtain an independent evaluation of the disagreement between LINA's reviewing physicians and Mattox's treating physicians.

Each of these arguments concerns what information LINA considered in its analysis of Mattox's claim for benefits and how LINA communicated this information to her. However, in its March 13, 2008 Order, the Court concluded that LINA was reasonable in the information it considered and

relied upon in deciding to terminate Mattox's LTD benefits. *Mattox I,* 536 F.2d at 1325. Mattox has presented no new evidence or argument with respect to this issue. Thus, the Court finds that these arguments regarding alleged violations of ERISA regulations and LINA's own policies and procedures remain unpersuasive and do not demonstrate that LINA was biased or acted arbitrarily and capriciously in terminating her benefits.

### 6. Disregard of Treating Physicians' Opinions

Mattox's final argument in her supplemental motion for summary judgment is that LINA improperly gave more weight to the opinions of Feagin and Seiferth than it did to the opinions of her treating physicians. She asserts that this de-emphasis of her treating physicians' diagnoses demonstrates bias.

Again, this argument relates to the nature of and weight given to the various pieces of information considered by LINA in deciding to terminate Mattox's benefits. As has been previously stated, in its March 14, 2008 Order the Court concluded that Mattox was reasonable in the information it considered and that LINA was justified in crediting the opinions of Feagin and Seiferth over those of Mattox's treating physicians. *Mattox I,* 536 F.2d

at 1325. Mattox has presented no new evidence on this point, and the Court will not change its ruling.

In sum, Mattox has failed to present any evidence that would suggest that bias played a role in the evaluation of her claim for LTD benefits such that LINA's decision to terminate her benefits was arbitrary and capricious. Conversely, LINA has presented substantial evidence that demonstrates that it has taken active steps to reduce potential bias and promote accuracy in its claims administration.

The compensation for those employees involved in the evaluation of Mattox's claim, including the reviewing physicians, was not related to the number of claims granted or denied, and there is no evidence that the employees had any other incentive to deny Mattox's claim. Further, the testimony of Lodi, Lyle, Betush, Feagin, and Seiferth indicates that LINA has sufficiently walled off claims administrators from the firm's financial department and has put in place management checks to detect and penalize inaccurate decision-making. Their testimony demonstrates that the claims and appeal staff do not have access to information regarding the monetary reserves available for claims and have no interaction with the financial

underwriters while a claim is pending.[7]  Additionally, they all testified that LINA has put in place mechanisms to review the quality and accuracy of the medical opinions offered by reviewing physicians and the determination of whether to grant or deny claims.

"There is no evidence in the record suggesting 'a higher likelihood that [the presumed conflict of interest] affected [LINA's] benefits decision,'" and therefore the conflict has little weight in the Court's analysis. *Doyle*, 542 F.3d at 1362 (quoting *Glenn*, 128 S. Ct. at 2351); *see also Miller v. Prudential Life Ins. Co. of Am.*, ___ F. Supp. 2d ___, 2008 WL 4540998, at *9 (S.D. Fla. Oct. 9, 2008) ("The record does not contain evidence of malice, self dealing, a parsimonious claims granting history, or other circumstances suggesting a higher likelihood that the structural conflict

---

[7] According to Lodi, certain individuals in the claims department could request reserve information from the finance department for the limited purpose of settling long-term claims.  He explained:

> There is an area within claims—a few people, actually, who are involved in I believe they're called long term financial obligation settlements, where they will identify claims, or a claimant will express an interest in wanting to settle out, if you will, their long term claim.  Part of their procedure or process of coming up with an offer, if you will, is taking into account the established reserve for that claim.

Because LINA's processing of "long term financial obligation settlements" is completely unrelated to Mattox's claim, Lodi's testimony is not relevant to the conflict of interest factor.

affected the benefit decision. The Court thus assigns the conflict factor a low importance rating . . . .").

Having considered the totality of the circumstances offered by both sides, the Court is convinced that LINA's decision was not tainted by LINA's presumed conflict of interest and was not arbitrary and capricious. *Accord Sanders*, 2009 WL 902046, at \*9 (finding that totality of the circumstances indicated that insurance company's conflict of interest was not a major factor in its decision even though company relied heavily on opinions provided by in-house medical consultants); *Everson v. Liberty Mut. Assurance Co.*, No. 1:05-cv-2459-RWS, 2009 WL 73140, at \*12-13 (N.D. Ga. Jan. 2, 2009) (finding insurance company's decision to deny benefits was not arbitrary and capricious and that conflict of interest was not a major factor in light of the plaintiff's failure to point to any evidence regarding a conflict of interest beyond its mere existence). Therefore, LINA is entitled to summary judgment on Mattox's claim for LTD benefits.

## III. Conclusion

For the foregoing reasons, Plaintiff's supplemental motion for summary judgment [143] is hereby DENIED. Defendant's supplemental motion for summary judgment [152] is hereby GRANTED. With respect to

LINA's counterclaim for overpaid benefits, LINA shall have ten days within which to file a brief setting forth its computations of the amount thereof; Mattox shall have ten days thereafter within which to file a brief in opposition, should she so desire; and LINA shall have five days thereafter within which to file a reply brief in support of its counterclaim.

IT IS SO ORDERED this 13th day of July, 2009.

Timothy C. Batten, Sr.
United States District Judge